Michelle R. Burrows 861606
MICHELLE R. BURROWS, PC
1333 NE Orenco Station Pkwy Ste 525
Hillsboro, OR 97124
503-241-1955
michelle.r.burrows@gmail.com

Leonard W. Williamson 910020
VAN NESS WILLIAMSON, LLP
285 Liberty St NE Ste 360
Salem, OR 97301
503-365-8800
l.williamson@vwllp.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| MELISSA VITELLARO,<br><br>        Plaintiff,<br><br>     v.<br><br>Oregon Department of Corrections (ODOC) Director Colette Peters, ODOC PREA Coordinator Ms. Ericka Sage, ODOC Deputy Director Brian Belleque, Tony Klein, ODOC Past Chief Medical Officer Dr Steve Shelton, ODOC Present Chief Medical Officer Dr. Christopher DiGiulio, ODOC Assistant Director of Correctional Services Heidi Steward, ODOC Health Services Manager Joe Bugher, Joe DeCamp, ODOC Chief Clinical Officer Dr. Danielle Fuzi, ODOC Chief Psychologist Dr. Don Dravis, ODOC Behavioral Health Services Administrator Dawnell Meyer, ODOC Assistant Director of Operations Michael Gower, ODOC Past Superintendent Rob Persson, John/Jane Doe CCCF Medical Director, Jane Doe CCCF Nursing Manager, John/Jane Doe BHS Counselors, John/Jane Doe Nurses, John/Jane Doe Security Staff, and State of Oregon,<br><br>        Defendants. | Case No. 3:19-cv-00174<br><br>COMPLAINT<br><br>(8th Amendment Failure to Protect, PREA Violations, Failure to Provide Medical Care, Failure to Supervise, Injunctive Relief)<br><br>JURY TRIAL DEMANDED |

1 - COMPLAINT

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff by and through her attorneys, brings her complaint herein. This matter is related to Suarez v. Peters USDC Case No. 3:19-cv-00095 BR. Plaintiff states and alleges as follows:

**INTRODUCTORY STATEMENT**

1.

This suit is filed by Plaintiff under 42 U.S.C. § 1983 for actions by the named defendants in failing to follow Federal, State laws and administrative rules concerning the protection of Plaintiff, a vulnerable person, who was an inmate in Coffee Creek Correctional Facility (CCCF), an Oregon Department of Corrections (ODOC) facility, until September 2018. Plaintiff was sexually assaulted twice while a patient in the infirmary/medical unit of CCCF while seeking medical care. Defendants failed to provide adequate supervision and training of staff specifically male nurses. ODOC failed to comply with Health Services requirements and common standards within the medical profession that male providers not be alone with female patients/inmates. ODOC further failed to adequate provide safeguard and protections for inmates from Defendant Tony Klein, a CCCF nurse, who, it is estimated, raped, sexually assaulted and/or sodomized no less than 15 female inmates between 2009 until 2018 while employed at CCCF. Defendants failed to recognize and respond to obvious signs Defendant Klein was grooming female prisoners, had a sexual predator pattern which was known to many staff members including other nurses in medical services, security staff and management at CCCF. Defendants failed to provide legally mandated counseling as required by the provisions of the Prison Rape Elimination Act (PREA) for the benefit and protection of the Plaintiff and subjected Plaintiff to recurring psychological damage by failing to treat her ongoing psychological injuries arising from the sexual abuse. Plaintiff is filing this suit in her own name but will be joined by no less than seven other suits by other women who were abused and assaulted by Defendant Klein.

2.

This court has jurisdiction over Plaintiff's claim of violations of federal Constitutional Rights under 28 U.S.C. §§ 1331 and 1343.

3.

Venue is proper under 28 U.S.C. § 1391(b), in that one or more of the defendants reside in the District of Oregon and Plaintiffs' claims for relief arose in this district.

4.

Plaintiff is entitled to her attorney fees pursuant to 42 U.S.C. 1988.

**PARTIES**

5.

Plaintiff is a resident of Oregon and was an incarcerated individual until October 2018. She presently resides in Oregon.

6.

Defendant Collette Peters was at all relevant times the Director for ODOC and responsible for the enforcement and compliance with Federal law, including the United States Constitution and the mandates of the Prison Litigation Reform Act (PLRA), the Prison Rape Elimination Act of 2003 (PREA), and the laws of the State of Oregon. Defendant Peters approves and signs PREA audits for every ODOC institution in Oregon. She has implemented a zero-tolerance policy for sexually assaulting inmates within ODOC by employees of ODOC. Defendant Peters has had Governor Kate Brown certify to the United States government that Oregon is in compliance in all regards and meeting all of the requirements of PREA for compliance in order to continue to secure federal funding to the State of Oregon.

7.

Defendant Brian Belleque is the Deputy Director for ODOC and responsible for carrying out and implementing all policies of the Director and the Policy Group. He is responsible for the overall safe and secure operation of all ODOC correctional institutions.

8.

Defendant Michael Gower is the Assistant Director of Operations. He is the direct supervisor of every ODOC Superintendent within ODOC. Defendant Gower has the authority to direct and implement changes within ODOC prisons. He oversees the budgeting for each institution and approves budget requests for security improvements within ODOC. Defendant Gower, as Assistant Director of Operations, is responsible for PREA compliance and the safe and secure operation of ODOC Institutions.

9.

Defendant Ericka Sage was until 2018 the PREA Coordinator for the Department of Corrections. As the PREA Coordinator she would pass along PREA audit recommendations to Defendants Peters, Belleque, Gower, DeCamp and the CCCF Superintendent and Assistant Superintendent of Security for CCCF for implementation.

10.

Defendant Joe Bugher was the ODOC Health Services Manager during all relevant times.

11.

Defendant Heidi Steward was the Assistant Director of Correctional Services having direct oversight over ODOC Health Services and the Health Services Administrator Joe Burgher during the relevant time period.

12.

Defendant Danielle Fuzi was the Chief Clinical Officer for the ODOC during the relevant time period.

13.

Defendant Dr. Don Dravis was the Chief Psychologist for the ODOC during the relevant time period.

14.

Dr. Steve Shelton was the Chief Medical Officer for ODOC until his retirement in 2018.

15.

Defendant Dr. Christopher diGiulio is the present Chief Medical Officer for ODOC.

16.

Defendant Dawnell Meyer was the Behavioral Health Services Administrator for ODOC during the relevant time period.

17.

Defendant Rob Persson was the superintendent of CCCF from 2011-2018 until he was promoted to West Side Administrator in May 2018.  Defendant Paula Myers replaced Defendant Persson at CCCF as Superintendent.

18.

Defendant Doe was the Assistant Superintendent of Security at CCCF and was responsible along with the Superintendent for ensuring PREA compliance and that inmates were safe from sexual assault at CCCF.

19.

Defendant Tony Klein was a registered nurse working in the medical services unit in both the medium and minimum facilities at CCCF.

20.

Defendant Jane Doe was the Nurse Manager for CCCF for the relevant time period.

21.

Defendants Jane and John Does were nurses working in the medical services at Coffee Creek and knew, or should have known, about Tony Klein's conduct.

22.

Defendants John and Jane Does are and have been Behavioral Health Services counselors at CCCF.

23.

Defendants John and Jane Does are security staff at CCCF who knew or should have known about Klein's predatory behavior and unauthorized conduct.

## FACTUAL BACKGROUND

### (Coffee Creek Correctional Facility)

24.

Coffee Creek Correctional Facility is a prison to house female prisoners in Oregon. It also serves as the intake center for all prisoners entering ODOC. CCCF is located in Wilsonville, Oregon and contains both a minimum facility and a medium facility. The facility has 1,684 beds and was first opened in 2001.

25.

Coffee Creek Correctional Facility has cell and dormitory housing, work programs, skills training, treatment programs, health services, religious service, physical plant, a central records unit and administrative areas.

26.

Since 2001, CCCF has been the location of numerous sexual assaults, rapes and misconduct by staff against female inmates.

a.  In 2004 Lt. Jeffrey Allen Barcenas pled guilty to four counts of official misconduct for engaging in sex with a female prisoner.

b.  In 2008 the State of Oregon was sued for sexual misconduct by female inmates alleging that Correction Officer Richard Mitchell was forcing women to expose themselves to and engage in sexual favors with Mr. Mitchell. Mr. Mitchell started working one month after Paul Golden was charged.

c.  In 2008 and related to the Mitchell abuses, Correction Officer Robert Dunlap was accused of abuse against a prisoner.

d.  In July 2009 ten women at CCCF accused Mr. Paul Golden of sexual misconduct and abuse. He was convicted of 15 counts of custodial sexual misconduct and the State was sued by the women. Mr. Golden was a groundskeeper who was able to isolate and control the women working on his ground crew. Mr. Golden was investigated three times by ODOC for alleged sexual misconduct before he was charged.

e.  At approximately the same time as Mr. Golden was being criminally processed and sued, additional women brought claims against Mr. Richard Rick, a civilian plumber, and Mr. Troy Austin, a civilian maintenance worker, both of whom worked at CCCF. Both Rick and Austin were convicted and the state was sued for the events leading up to the abuses.

f.  In 2009 CCCF correction officer Darcy MacKnight was convicted of custodial sexual misconduct for having sex with a female prisoner.

g.  In 2010 Food Services Coordinator Christopher Don Randall pled guilty to two counts of official misconduct for engaging in sexual intercourse with a female inmate.

h.  In 2012 Physical Plant employee Jeremy Joseph Veele was charged with official misconduct for sexually abusing one female prisoner.

i.  In 2012 Shawn Riley, a civilian employee at CCCF, was arrested and charged with official misconduct and custodial sexual misconduct for sexual acts against a female prisoner.

j.  In February 2016 corrections officer Edgar Mickels was arrested and charged with first degree sexual misconduct and three counts of custodial sexual misconduct.

k.  In 2017 Brian Joseph Balzer was found guilty of first degree custodial sexual misconduct for his conduct with an inmate at CCCF. Mr. Balzer's victim alleges there were other victims.

l.  In April 27, 2017 Dr. Robert W. Snider was sued by three inmates alleging they were sexually abused by Dr. Snider during unsupervised examinations while incarcerated at CCCF.

27.

Statistically Oregon Department of Corrections reported that in 2011 19 cases of sexual abuse were reported but only 5 were founded. In 2014 there were 93 total reported with 15 founded and in 2016, 67 instances of sexual abuse were reported but only 8 were determined to be founded. These statistics are not accurate nor reflective of the events presently occurring in Oregon. Plaintiff and the other related cases herein report that staff will intimidate reporting inmates, put them in segregation, and subject them to other punishments in an effort to dissuade them from reporting. In some instances, staff make a concerted effort to intimidate all women at CCCF from making any reports of sexual abuse.

28.

Plaintiff has reason to believe based on reports and investigation that certain security staff have engaged in a policy and practice to intimidate and frighten women from coming forward as a prophylactic method to scare women. Women report they have to "be nice" to nurses to get treatment. One woman reports that Officer Blackburn is particularly difficult in that he views his role as a union representative to aggressively mistreat women to prevent claims being made against other corrections officers. During interviews investigating for this case, several officers, including Officer Blackburn, were seen to walk by the interview room and several women noted those officers had no particular reason to be present and had conducted aggressive questioning and shake downs following the meetings.

29.

Following the investigations noted in paragraph 28 above, several of the victims were placed in segregated housing, lost their jobs, lost their programs and were subject to intimidation and threats by security staff. None of the women in this case or others handled by attorney for Plaintiffs herein have received any mental health counseling or access to the PREA victim's advocate since ODOC terminated the agreement with Ms Brianna Ellingson. No reason was given for the termination of the contract with Ms Ellingson but the replacement contract has had

no contact with any victim of sexual abuse by Defendant Klein. The victims of sexual abuse have a history of mistreatment by ODOC such that they believe they will lose housing, go to the 'hole', lose their jobs, lose visits with family and children, have no access to mental health counseling and will be subject to numerous daily indignities by security staff who attempt to coerce inmates into silence.

## OREGON STATUTES

30.

Oregon Revised Statutes 423.020(1)(d) mandates the Oregon Department of Corrections to provide adequate food, clothing, health and medical care, sanitation and security for persons confined.

31.

Oregon Revised Statutes 423.075(5)(d) states the Director of the Oregon Department of Corrections shall provide for the safety of all prisoners in the custody of the department.

32.

On August 20, 2012, the Department of Justice issued the final rule adopting national standards to prevent, detect, and respond to prison rape, as required by the Prison Rape Elimination Act of 2003 (PREA).[1]

33.

The Oregon Department of Corrections has a zero-tolerance policy for sexual abuse.  The Prison Rape Elimination Act of 2003 is a federal law that seeks to eliminate sexual assaults and sexual misconduct. This law applies to all federal and state prisons, jails, police lock-ups, private facilities, juvenile facilities, and community correctional settings. The Bureau of Justice Statistics carries out, annually, a comprehensive statistical review and analysis of the incidence and effects of prison rape. The major provisions of the standards are: General prevention planning, supervision and monitoring, cross gender searches and viewing, training and

---

[1] ODOC webpage.

9 - COMPLAINT

education, screening, reporting, responsiveness planning, investigations, discipline, medical and mental health, grievances, and audits. DOC continues its efforts to maintain safety for all inmates and others inside the facilities keeping PREA as a top priority.[2] ODOC in inmate publications, handbooks, posters, fliers, and other types of communications with inmates has created an expectation that ODOC will do everything within its powers to protect inmates from staff assault and that ODOC expects inmates to be respected by staff at all times.

**(Medical Care at CCCF)**

**OAR 291-124-0005 et seq**

34.

The Health Services Administrator is responsible for directing inmate health care services including developing standards for the organization, coordination and delivery of healthcare, ensuring the operation of inmate healthcare comply with appropriate professional standards, statutory requirements and administrative rules and policies. OAR 291-124-0016(1)

35.

The Health Services clinical medical director is responsible for professional oversight of clinical healthcare providers. The Health Services clinical director shall appoint a chief medical officer to provide oversight for professional clinical services to inmates at each facility. OAR 291-124-0016(2)

36.

The Behavioral Health Services administrator is responsible for the overall organization and delivery of mental health services to inmates. The Chief Psychiatrist shall have clinical oversight of the professional services of behavioral health prescribers. OAR 291-124-0016(4)

37.

The administrator for Clinical Operations is responsible for overall organization and delivery of institutional clinical care. OAR 291-124-0016(6)

---

[2] ODOC Webpage https://www.oregon.gov/DOC/INSPEC/PREA/pages/prea_more.aspx

38.

Health Services administration shall appoint a Medical Services manager to organize and coordinate delivery of healthcare services to inmates for each Department of Corrections facility. OAR 291-124-0016(9)

39.

ODOC Health Services is responsible for providing medical care to over 14,000 inmates across the State, incarcerated within the 14 institutions of the Oregon Department of Corrections State Prison system. The State has a moral and legal obligation to provide health care for those people whom it incarcerates. The Federal Courts have mandated that inmates, though incarcerated, remain entitled to basic medical care.  These inmates enter the system with a lower than average educational level, lower than average income, and a higher than average rate of illness and chronic disease. At least 12% have heart disease or respiratory disease; 23% have moderate or severe mental health problems; and up to 70% report alcohol or drug problems. In addition they often have had poor prior medical care. Oregon.gov/doc/OPS/HESVC.

40.

According to the Oregon Department of Corrections website, "In Health Services we see medical problems similar to any that exist in the outside community, ranging from major to minor problems, acute illnesses or injuries to ongoing care for chronic diseases, preventative health care to end-of-life care. The nursing staff engages in over one thousand patient care contacts each day statewide and the Physician/Family Nurse Practitioner/ Physician's Assistant staff provides more than 250 on-site primary care appointments each day. We have 5 institutions with onsite infirmaries with approximately 76 infirmary beds. ODOC Health Services provides extensive primary care onsite and also provides appointments in the community with specialists such as cardiologists, surgeons, and gastroenterologists as needed. ODOC Health Services also provides hospitalization in the community hospitals when necessary. This health care is provided at a cost per inmate per month, which is lower than any other comparable insurance program in

Oregon including the Oregon Health Plan. Health care coverage is prioritized by medical

relevance and need in a ranking system similar to the Oregon Health Plan".

Oregon.gov/doc/OPS/HESVC.

41.

Oregon Department of Corrections also notes: "All of our health care programs have

passed accreditation standards set by the National Commission on Correctional Health Care

(NCCHC) and are currently accredited".

42.

National policies developed by NCCHC and the American Medical Association (AMA)

recommend that male medical providers have a chaperone when treating a female patient.

43.

Throughout most of the events set forth in this complaint and the related litigation filed

subsequently, CCCF provided health services to female inmates through both a kyte (written

request) system and a triage system. Before 2018 female inmates could send a kyte to medical

services requesting medical care. Once the kyte was received, typically a nurse would set up the

inmate for a visit to medical normally with an assigned practitioner, but often with a nurse. This

paper system provides an opportunity for records or request to be easily destroyed or lost.

44.

Prior to 2018, in order to secure any medical care, female prisoners were required to sign

up for "triage" for the next day. All prisoners signed up for triage were sent to medical to be seen

briefly by a triage nurse. If the triage nurse felt the medical issues deserved follow up with a

physician, the nurse was solely in charge of making that decision. No one engaged in sign out of

prisoners from their living quarters or when the prisoners reached triage or medical.

45.

Defendant Klein was employed at CCCF as a registered nurse. Plaintiff does not have information as to how long he was employed for the State of Oregon but information indicates he has been a nurse at CCCF since at least 2009.

46.

Defendant Klein systematically sexually harassed, assaulted and pursued female inmates throughout his employment at CCCF. His behaviors evolved and became more obvious and brazen such that many security staff and other staff in medical services were aware. Defendant Klein would test the boundaries of security and his victims to see if anything would happen. Plaintiff has information of only one staff member who took steps to protect any inmate from Klein's predatory behavior.

47.

Defendant Klein worked in many posts as a nurse at CCCF. Defendant Klein worked in triage assessing the care needs of prisoners who appeared for assessment. This post afforded Defendant Klein opportunities and access to his victims outside the normal clinic environment. Defendant Klein also worked in medical services treating patients who were being seen. Defendant Klein also had certain supervisory duties over female orderlies in medical services.

48.

In addition to female inmate patients, Defendant Klein was allowed access to female orderlies in medical services without any chaperone or supervision. He was permitted to be alone in exam rooms or closets or private places in medical services with female orderlies. Defendant Klein fondled and raped women in these private areas. Plaintiff is aware of at least four women prison orderlies that Defendant Klein was allowed to have private access to and did, in fact, either rape, sodomize or sexually traumatize including the use of strangulation of them for sexual enhancement.  Most of the women involved in these assaults were too afraid to come forward

based on the manner in which women were treated in the previous investigations noted in paragraph 29 above.

49.

Defendant Klein was largely unsupervised in his daily duties and was able to call inmates to medical from their housing units to medical even if the women had no medical issues. He was allowed to call female prisoners to medical late at night and during the weekend. Female prisoners must comply with orders.

50.

When each of these women were called from their housing units there was no sign out required by security staff at the housing unit, no sign in at medical services and no electronic passes or monitoring of the movement of the women through the prison. Klein rarely documented these impromptu visits as they were largely designed for his sexual satisfaction. Sometimes Klein made notes in the medical charts but many times those notes were entered by other nurses in medical.

51.

Defendant Klein identified women who were particularly vulnerable either because of significant historical sexual abuse or trauma in the women's lives. Other signs of vulnerability relied on by Defendant Klein were prisoners relatively new to prison or those with significant drug or alcohol addiction issues. It is alleged Defendant Klein provided drugs to some women with addiction histories in order to continue with his sexual mistreatment of them. But all the women selected by Klein met a rough profile of having extensive sexual abuse histories which were easily accessed by Klein on the ODOC central recording keeping database. Mr. Klein generally preferred younger pretty women but as his skills in predation increased, and as he grew more confident in the fact that no one else was watching his increasingly emboldened behaviors, he took every available opportunity to engage in sexual contact with female patients.

52.

Defendant Klein wore scrubs to conduct his duties and rarely wore any underwear. The pants were held up by a string allowing him to easily access his penis for sexual activity without undressing. Defendant Klein frequently requested women inmates to wear shorts to medical appointments in order to sexually molest them more easily. This practice became well known amongst the female prison population and many of the victims of Defendant Klein avoided appointment to medical because of his predatory actions.

53.

During medical appointments Defendant Klein met with women alone, often dismissing chaperone nurses and engaging in sexual activity which included fondling of breasts, digital penetration, rubbing hands and feet on his erect penis, rape and forced sodomy including some involving choking. Plaintiff estimates that no less than 15 women were abused in this fashion though it is believed the number is much larger given the fact no one was paying any attention to Klein and it is unknown whether ODOC engaged in any real investigation.

54.

Defendant Klein began his pursuit of certain women with grooming behavior designed to elicit trust including complimenting women, flirting with women, engaging in personal conversations, providing special benefits to them. Defendant Klein was known by other nurses and medical staff as a flirt and a little creepy. As the years progressed Klein no longer worried about hiding his behavior and often would have sexual contact with patients with other staff present.

**PREA**

55.

The Prison Rape Elimination Act (PREA) became federal law in 2003. The Oregon Department of Corrections adopted the mandates of PREA in Rule 40.1.13. The rule was

15 - COMPLAINT

modified in 9/2018 and the version applicable to the events alleged herein was formally adopted

9/1/2016.

56.

The purpose of PREA is to provide for the analysis of the incidence and effects of prison

rape in federal, state and local institutions and to provide information, resources,

recommendations and funding to protect individuals from prison rape. PREA seeks to establish a

zero-tolerance policy regarding rape and sexual abuse inside correctional facilities. PREA also

mandated the publication of standards to ensure compliance and to improve prevention, detection

and response strategies in addressing sexual abuse and assault.

57.

The requirements of DOC Policy 40.1.13 and PREA include prevention, planning,

investigation, prosecution, and provide counseling and treatment to victims. Oregon identifies

itself as being committed to a zero-tolerance standard for sex abuse and sex harassment.

Policy 40.1.13 I.

58.

The Agency PREA Coordinator is responsible for the development, implementation and

oversight of the department's compliance with the PREA standards in all department facilities.

Policy 40.1.13 II.A. In order for this coordination to occur the Operations Division, which

Defendant Gower is in charge of, has to authorize the recommended implementation

recommendations. Without the adoption, cooperation on approval of the Operations Division, the

Agency PREA Coordinator lacks authority to enact change.

59.

The PREA compliance manager is a management staff person designated by the

institution functional unit manager, with sufficient time and authority to coordinate the facilities'

efforts to comply with the federal PREA standards. Policy 40.1.13 II.F. However, absent the

approval and direction of the Superintendent and Assistant Superintendent of Security, the PREA

Compliance Manager lacks operational authority to make any changes or order anything to occur differently at an institution.

60.

Sexual abuse of an inmate by a staff member, contractor or volunteer includes any of the following acts, with or without consent of the inmate, detainee or resident:

a. contact between the penis and vulva or the penis and anus including any degree of penetration,

b. contact between the mouth, the penis, vulva or anus,

c. contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire,

d. penetration of the anal or genital opening by hand, finger, object or other instrument, that is unrelated to official duties or where the staff member contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire,

e. any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh or the buttocks that is unrelated to the official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire,

f. any attempt, threat, or request by a staff member, contractor of volunteer to engage in the activities described in this section,

g. any display by a staff member, contractor or volunteer of his or her uncovered genitalia, buttocks or breast in the presence of an inmate, detainee or resident, and

h. voyeurism by a staff member, contractor or volunteer. Policy 40.1.13.II.G

61.

The Sexual Abuse liaison is a management staff person designated by the institution functional unit manager to coordinate response, reporting and monitoring of inmate abuse with

the institution. The sexual abuse liaison shall be assigned as the Sexual Abuse Response Team (SART) leader.

62.

The SART is a team of institution staff consisting of a Behavioral Health Services (BHS) staff member, a Medical Services staff member and the sexual abuse liaison who are designated by the functional unit manager to respond to all allegations of inmate sexual abuse or sexual coercion.

63.

All staff are covered by the mandates of PREA and Policy 40 including all ODOC employees, OCE employees, contract service providers and volunteers.

64.

Policy 40 mandates that all ODOC staff "must be able to recognize the signs of sexual abuse and sexual harassment and understand their responsibility in the detection, prevention, response and reporting of an alleged sexual abuse or sexual harassment".

65.

Each facility is required to conduct and document unannounced rounds on all shifts to deter staff sexual abuse and sexual harassment. Staff is prohibited from alerting other staff members that the supervisory rounds are occurring.

66.

The department shall ensure that each facility it operates develops and documents a staffing plan that provides for adequate levels of staffing to protect inmates against sexual abuse.

67.

Policy 40 requires regular training for staff on detecting sexual abuse, supervision of inmates, new employee orientation and orientation to all staff on sexual abuse and the zero tolerance policy shall be given, inmates are to be educated on "avoiding" risk situations, safely

reporting sexual abuse, obtaining mental health services if victimized, the inmate's right to be free from sexual abuse and the inmate's right to be free from retaliation.

68.

Policy 40 mandates access to services for inmate of all sexual abuse or sexual harassment including reporting. Inmates who are found to have made "bad faith" allegations of sexual abuse will be held accountable through all means available to the DOC including discipline. It is not known to Plaintiff which ODOC staff members are properly trained in sexual abuse and misconduct investigations.

69.

Policy 40 mandates all staff to report "immediately any knowledge, suspicion or information regarding sexual abuse, sexual harassment, retaliation by inmate or staff for reporting or staff neglect or violation of responsibility that may have contributed to such incidents.

70.

Policy 40 sets forth the procedures to be followed when a complaint of sexual abuse or harassment is received. The PREA Compliance Manager shall be responsible for monitoring all inmates and staff to protect from retaliation or harassment by other staff or inmates. Typically CCCF requests the Oregon State Police to conduct criminal investigations into allegations of sexual abuse inside the prison.

71.

The Oregon Department of Corrections states there is to be no long-term forfeiture of services and programs for victims of sexual abuse and that the safety of the victim is paramount. Inmates will be housed in the least restrictive housing, will have timely unimpeded access to emergency medical treatment, necessary post event treatment including coordination with community hospitals, testing for sexually transmitted diseases, comprehensive information and timey access to all lawful pregnancy related medical services, referral to Behavior Health

Services and communication with a designated sexual abuse liaison regarding further information required.

72.

Mental health services are required to be provided for victims of sexual abuse including timely, unimpeded access to appropriate mental health evaluation services without financial cost, comprehensive information on the limits of confidentiality and duty to report, completion of a mental health evaluation to include suicide risk screening, notification of the Officer in Charge and Medical Services regarding recommended actions, follow up mental health services.

**Response to Prior PREA investigations**

73.

Following the sexual abuse investigations noted in paragraph ## above many of the women victims were placed in the hole, lost their jobs, housing and were limited in visits with children and family. The superintendent for CCCF initiated an internal review which found that they had inadequate security patrols, rooms without windows or adequate surveillance and too many employees had access to limited private areas, and a shortage of surveillance cameras. The superintendent adopted a "Rule of Three" which prohibits entry into some parts of the prison unless three people a mix of staff and inmates are present.

74.

Budget requests were made of the state legislature for funding of additional cameras and even electronic passes to tract the location of all personnel and prisoners inside the prison. Funding was denied for most of these requests or alternatively Defendant Peters and the other Defendants did not seek funding at all.

**Melissa Vitellaro**

75.

Ms. Vitellaro released from prison in December 2018. She filed a timely Notice of Tort Claim which was denied by the Oregon Department of Administrative Services claiming she had

never seen Defendant Klein in medical. They noted that there were no charted visits. This is false.

76.

Ms. Vitellaro has a documented history of childhood rape involving multiple male assailants which led to a diagnosis of Post-Traumatic Stress Disorder. The PTSD resulted in drug and alcohol abuse. Ms. Vitellaro has been diagnosed with an Axis I alcohol dependence. She also scores for mood disorders and a major depressive disorder. Ms. Vitellaro was the victim of extreme physical abuse by an adult partner nearly resulting in her death. She suffers from significant emotional losses from these two episodes which includes fear of men and violence from men. She distrusts her own judgment in these situations and will often take a route with men with the likelihood of producing less violence from the men.

77.

Ms. Vitellaro was incarcerated in 2010 through 2015 during which she met with Defendant Klein for the first time. In that earlier encounter, Defendant Klein was Plaintiff's appointed provider to assist her with widespread blisters and sores on the bottom of her feet. There is a documented encounter in Ms. Vitellaro's medical chart with Defendant Klein on 6/22/13. Ms. Vitellaro notes that during that visit with Klein during her first incarceration, Klein treated her blisters by massaging her legs, running his hands up her thighs and penetrated her vagina with his finger.

78.

Ms. Vitellaro was incarcerated a second time in 2017 through 2018. She saw Defendant Klein on 7/3/17 for foot treatment. Plaintiff's medical chart has a handwritten note signed by Defendant Klein for that date.

79.

Ms. Vitellaro was standing in med-line when Defendant Klein approached her to speak with her. He later called her to medical to see him. He was alone when she saw him for a simple

procedure. He began the medical treatment but he then put his hands over her vulva and massaged her. She stopped him, left and did not return to medical until Klein was removed from the prison. Ms. Vitallero describes Defendant Klein as "creepy", "handsy", charming and would regularly flirt with everyone, even other nurses. He engaged with women in a manner similar to a "used car salesman". He would talk about very personal and inappropriate topics to instill a sense of intimacy and would design to create the feeling of a special relationship. Ms. Vitallero is aware that at the time of both of her assaults by Mr. Klein she knew of at least eight other women who were the victim of sexual advances, rape and assaults by Mr. Klein.

80.

Ms. Vitellaro recalls being in prison during some of the sex abuse scandals noted previously in this complaint. She recalls that the victims of those complaints would be sent to segregation (the hole), would be isolated and would lose their housing and jobs. She was concerned that if she came forward and gave any statement she would be subject to the same treatment.

81.

Defendants Peters, Belleque, Gower, DeCamp, Steward and Person have known for years of various different technology security solutions that would aid in the prevention and deterrence of sexual assault in prisons.  For example, within the corrections industry prisons have used radio frequency identification (RFID) tags for tracking individual inmate and staff movement in real time within the walls and fences of prisons.  The RFID is worn in a wrist band or ankle band. The technology allows the prison to tracking inmate and staff movement 24/7.  The system would alert the institution if a staff member were alone with an inmate within a particular area and send a security alert.  Because both inmate and staff are monitored there is a significant deterrence to staff isolating an inmate for assault and there is a digital record or footprint of their movements within the facility.  The RFID system can also be used to monitor prison gang activity and send alerts when known gang members are congregating together or are in close

proximity to vulnerable inmates.  This system would have easily monitored defendant Klein's movements within CCCF.

82.

Women prisoners are subject to significant degrading and dehumanizing treatment simply because they are incarcerated. While they may be sentenced to a few years in prison, they are not sentenced to years of rape, sodomy and sexual assault. They are captive in prison and must take all actions asked of them by prison staff or they can lose jobs, housing, and visits with their children, which are the total sum of what they are entitled to in prison. And as previously alleged herein, certain security staff make it their business to demean these women even more by threatening and bullying them. This is in contrast to the public face that ODOC displays with its outward appearance of support of PREA and its zero tolerance policies against the sexual assault of inmates. ODOC has created an expectation that certain standards will be met, laws will be followed, rights will be protected and that inmates will be safe. Yet year after year the women inmates at CCCF are victimized by staff.

83.

As a result of the sexual abuse by Defendant Klein and the failure by other staff and management staff to supervise Klein, Ms. Vitellaro suffered extreme anxiety, was prevented from accessing medical care, had exacerbation of her underlying PTSD and anxiety disorder, felt extremely unsafe and vulnerable in her incarceration and felt no one would protect her if even worse things occurred.

84.

As a result of the numerous failures by staff, management and policy to protect her, Melissa Vitellaro suffered economic and non-economic losses of no less than $5,000,000. She remains emotionally traumatized and is seeking mental health counseling and is experiencing additional losses to her sense of safety and well-being.

**FIRST CLAIM FOR RELIEF: 42 U.S.C. §1983**

**Violations of 8th/14th Amendment: Sexual Battery**

**Defendant Klein**

85.

Plaintiff realleges all previously alleged matters.

86.

Plaintiff is entitled to be held in safe and humane conditions of confinement throughout her incarceration. She is entitled to be free of unwanted and unwarranted sexual touching and abuse. She is entitled to her own personal bodily integrity whether in custody or not pursuant to the parameters of the 8th and 14th Amendments to the United States Constitution. Plaintiff is also entitled to be safe and secure from undue and excessive force while in custody.

87.

The acts and omissions of Defendant Klein violated Plaintiff's protected rights and were an excessive intrusion onto her person without just cause and amounted to deliberate indifference to Plaintiff's protected rights and her own personal safety. Defendants violated the requirements of the 8 and 14th Amendment rights held by Plaintiff through the use of excessive force, intentional and abusive sexual assault, kidnaping, warrantless searches and subjecting her to unsafe and inhumane conditions of confinement.

88.

The specific acts of Defendants individually and alleged to be deliberately indifferent are more particularly set forth below.

1. Defendant Klein physically restrained, sexually touched or caused serious bodily harm and significant mental distress to Plaintiff. The actions of Defendant Klein against Plaintiff occurred in July 2017.

2. Between roughly 2009 and his 2018 removal from the prison, Mr Klein was sexually molesting, touching, raping or sodomizing numerous other women often on a daily basis;

3.  Defendant Klein acted in violation of existing medical protocols, standards of care, the United States Constitution, state and federal laws as well as rules.

89.

As a result of the violations of the Constitutional standards set forth herein, Plaintiff suffered forcible, non-consensual and physical assaults to her person, severe emotional trauma from the ongoing assaults and threats, and a significant deterioration in her mental state causing her to become severely depressed. Ms. Vitellaro suffered extreme fear while the assaults were occurring which was made worse because she knew or believed that no one would stop Defendant Klein and would likely blame her. She was isolated, helpless and disregarded. As a result of the violations of the Constitutional standards set forth herein, Plaintiff has suffered from forms of stress, depression, anxiety and an exacerbation of her underlying problems from early sexual abuse.

90.

As a result of the violations of the Constitutional standards set forth herein, Plaintiff continues to suffer from post-traumatic anxiety, stress, anger and depression and ongoing battles with stress.

91.

As a result of the violations of the Constitution Plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no less than $5,000,000. Plaintiff seeks punitive damages against Defendants.

92.

All Defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct was not only well below the standard prescribed by law herein but was illegal per se.

**SECOND CLAIM FOR RELIEF: 8TH Amendment violation**

**Failure to Protect: All Defendants**

25 - COMPLAINT

93.

Plaintiff realleges all previous paragraphs as if more fully set forth herein.

94.

Plaintiff, as a prisoner confined to a correctional facility, is entitled to be provided the essential aspects of a safe, sanitary and humane confinement including protection from harms and threats to his safety and security under the laws of the State of Orgon and the 8th Amendment to the United States Constitution.

95.

Plaintiff is entitled to the full protection of the laws including the Prison Litigation Reform Act and the Prison Rape Elimination Act which requires ODOC and defendants to comply with the laws in providing protection from assault including rape, providing protection to vulnerable inmates and to comply with all aspects of intervening and providing a safe environment to Plaintiff.

96.

Defendants violated the Constitutional and statutory rights held by Plaintiff in the following ways:

1. Failed to provide adequate monitoring of Defendant Klein while he treated female patients;

2. Failed to object, stop or discipline Klein for his obvious, continual and open grooming behaviors, repeated inappropriate touching, repeated inappropriate comments, flirtatious conduct and obvious sexual contact with numerous female inmates on a daily basis;

3. Failed to enforce existing safeguards designed to protect female patients including the use of chaperones;

4. Willfully ignoring clear violations of restrictions on contact and behavior permitted between staff and inmate;

5. Willfully ignoring clear signs of "grooming" and sexualized behavior by staff toward inmates;

6. Failing to monitor Klein's unlimited access to inmates of his choosing outside of normal medical unit hours;

7. Failed to provide adequate security monitoring of the movement of women to and from medical units;

8. Failed to provide adequate procedures for patients to access medical including movement, signing in and out, procedures for ad hoc orders to visit medical units in off hours, allowing private access by medical providers with inmates, punishing inmates for refusing medical care;

9. Provided an openly hostile, abusive, demeaning and threatening environment for all women prisoners including threatening them proactively with punishment if they complained, automatically dismissing complaints of sexual conduct by staff, removing privileges and benefits of the women if they made complaints of sexual misconduct, actual enforcement of disciplinary measures on women to dissuade them from making complaints, failing to provide anonymity for women to make complaints or participate in investigations, advising women they would be punished for making complaints and a long history of accusing prisoners of lying about sexual experiences;

10. Failed to permit the victims of Mr Klein's sexual abuses access to their own chosen PREA advocate Brianna Ellingson by summarily dismissing her in the middle of the Klein matter without explanation and failing to provide an adequate easily accessible replacement;

11. Engaging in intimidating behaviors when the victims of sexual abuse met with their lawyers, received legal mail or received information from Ms. Ellingson;

12. Ordering BHS counselors not to provide sexual abuse survival counseling to the victims;

13. Failing to provide adequate post-abuse therapeutic counseling despite repeated requests by the victims; and

14. Engaging in inappropriate searches, confiscating legal mail, and reading and seizing therapeutic journals kept by the women.

97.

As a result of the behaviors of the defendants herein Plaintiff suffered repeated sexual assault, was placed in constant fear for her safety, felt fear to meet with advocates, was denied abuse counseling, could not safely access medical care and her underlying anxiety and PTSD were severely exacerbated.

**THIRD CLAIM FOR RELIEF:  8TH Amendment Violations**

**Delay and Denial of Essential Psychological and Medical Care**

**All Defendants**

98.

Plaintiff realleges all previous paragraphs as if more fully set forth herein.

99.

Plaintiff is entitled to timely and adequate medical/psychological care as part of her Constitutionally guaranteed conditions of confinement pursuant to the 8th Amendment to the United States Constitution. Failure to provide timely and adequate medical care is a violation of the 8th Amendment prohibitions against cruel and unusual punishment. Furthermore, the PREA defines additional mandates for treatment after a sexual assault which is guaranteed to each prisoner.

100.

Plaintiff was denied any psychological treatment, counseling or mental health care as required by state and federal law and in fact was told no such treatment would be provided because of orders from the highest levels of ODOC management.

101.

Plaintiff is entitled to timely unimpeded access to appropriate mental health evaluation, mental health evaluation including suicide risks, mental health services follow up as needed pursuant to federal and state law and the 8th Amendment to the United States Constitution.

102.

Defendants denied Plaintiff mental health evaluations, mental health treatment and any and all follow up to address her depressive issues arising from the assaults and her psychological trauma resulting from the assaults as required by law.

103.

As a result of the failures by defendants herein Plaintiff suffered ongoing psychological trauma as she was denied treatment and further traumatized by the indifferent and demeaning treatment by Defendants. Her psychological condition has deteriorated and been exacerbated by the numerous failures of defendants here all to Plaintiff's economic and non-economic damage of $5,000,000.

## FOURTH CLAIM FOR RELIEF

### 8th/14th Amendment Violations–42 U.S.C. §1983

<u>Failure to Supervise</u>: Sage, Belleque, Peters, Gower, Medical Services Director, Nursing Manager, Shelton, DiGiulio, Steward, Bugher, Fuzi, Dravis, Meyer, Doe Defendant Assistant Superintended of Security at CCCF

104.

Plaintiff realleges all previous paragraphs as if more fully set forth herein.

105.

The constitutional deprivations suffered by Plaintiff are the proximate and direct cause of a non-interested, indifferent and willfully ignorant supervisory practice by the named defendants. The supervisors have a constitutional duty to protect prisoners and to provide them with a safe and humane condition of confinement including the right to be free from sexual abuse and

assault by staff. This duty imposed on supervisory staff includes the obligation under law to fully investigate claims of sexual misconduct by staff against prisoners, the mandatory duty to report and address claims of sexual assault on prisoners, the duty to maintain a good and constant supervision of male staff supervising female prisoners. The duty is enhanced when the prisoner population is especially vulnerable particularly if they are smaller, physically weaker, more vulnerable because of past sexual abuse and their ability to be easily abused.

106.

The constitutional deprivations committed by the supervisory staff were long-standing and in the face of several years of obvious and notable signs about the predatory habits of Klein, such as his ability to set his own schedule, roam the facility at will, pull inmates from their housing units during off hours, have unchaperoned access to women, exhibit increasing bizarre and sexualized behaviors, his failure to follow recommended guidelines for interactions with patients and prisoners, his lack of accountability, numerous rumors and innuendo, and a complete lack of investigation and follow up.

107.

The supervisory staff failed in the following particulars:

1. Failed to implement adequate inmate monitoring and managing process after the repeated sexual violations at CCCF noted above;

2. Failed to provide adequate safeguards to keep inmates from meeting alone with staff;

3. Failed to ensure that male medical providers were chaperoned in physical exams with women;

4. Failed to do regular audits and evaluation of inmate movement to medical including keeping records of the reason for the visits, the timing and the nature of the visit;

5. Failed to note and respond to evidence of abuse, and the obvious and clear record of a serial predatory sex offender in their midst;

6. The supervisors refused to take action because they purposefully disregarded the complaints of prisoners, did not believe anyone would care about the wellbeing of the prisoners, did not believe anyone would believe prisoners and generally allowed Klein to thrive in plain sight;

7. Supervisory staff treated the prisoners as if they deserved the abuse they received. If any one of the supervisory staff had followed through on the complaints and obvious signs of abuse none of the plaintiffs in this action would have been sexually assaulted or abused;

8. Supervisors tolerated if not encouraged an atmosphere of bullying, threatening and retaliating against inmates who came forward with concerns about the sexual behavior of staff;

9. Supervisors tolerated and encouraged staff to take proactive measures discouraging complaints about sexual behaviors;

10. Supervisors refused to allow victims to access legal mail, legal counselors, searched legal mail, instructed grievances to be denied and delayed for arbitrary reasons by Ms. Arrington and made visits to intimidate women meeting with PREA advocates and lawyers;

11. Supervisors have taken an informal policy approach that the staff members are more important than prisoners and must be protected from any and all complaints by prisoners; and

12. Supervisors issued orders that the victims of Klein would not receive the guarantees of federal and state law including mental health counseling and access to their chosen PREA advocate.

108.

Furthermore the supervisory staff failed these plaintiffs by failing to institute national standards for prison security by failing to inspect staff members coming and going from prison, failing to stop the introduction of contraband into the prison by staff, failing to follow up on

location and work production by subordinate staff, failing to demand accountability by subordinate staff, failing to have safe and adequate investigative procedures for complaints made by prisoners toward staff.

109.

As a result of the unconstitutional practice by supervisor which was promoted, allowed or facilitated within CCCF, female informants, witnesses or victims of sexual abuse were ignored, or retaliated against for filing complaints of sexual abuse.

## FIFTH CLAIM FOR RELIEF
### Injunctive Relief
### State of Oregon

110.

Plaintiff realleges all previous paragraphs as if more fully set forth herein.

111.

Plaintiff is entitled to seek injunctive, declaratory and protective relief in cases brought pursuant to 42 U.S.C.1983. Plaintiff may bring such claims against the state without raising concerns of sovereign immunity.

112.

Defendant State of Oregon, by and through the Oregon Department of Corrections is obligated by federal law and the United States Constitution to protect inmates from sexual abuse and assault. The passage of the Prison Rape Elimination Act in 2003 and the subsequent formalizing of the requirements into state mandate by Rule 40.1.13 imposed statutory and federalized duties on the State of Oregon to insure they adhered to the national standards in training of staff in detection of sexual misconduct, investigation of sexual misconduct based claims, prohibitions against retaliation against victims who raised claims, post investigative procedures, protection of victims and the provision of medical and psychological care to those victimized by sexual abuse inside prisons.

113.

The Department of Corrections, the immediate past Director of ODOC, and the present Director of ODOC publicly note their strong adherence to a zero-tolerance policy for sexual misconduct inside the prisons. This is evidenced by numerous public statements, press releases and Ms. Peters has traveled broadly in the United States giving pubic speeches, engaged in education and training touting her strong adherence to such a zero-tolerance policy.

114.

The State of Oregon is obligated under the terms and conditions of federal mandate to provide regular audits and updates on incidence of sexual misconduct and investigations. The numbers reported by ODOC indicate that a very very few number of complaints result in actual findings of fault. Plaintiff alleges these audits and findings are not accurate and have been influenced by ODOC's political agenda and fiscal obligations. The Oregon Department of Corrections made assurances and promises to the state legislature on PREA compliance to obtain funding and to represent it is in compliance with all levels and aspects of PREA requirements. Plaintiff alleges these statements by ODOC are likely inherently flawed, falsified or manipulated and do not reflect accurately the state of matters inside CCCF at least.

115.

Plaintiff alleges since the opening of CCCF in 2001 there have been no less than 13 separate sex abuse "scandals" often involving multiple women and conduct traversing several months and years. Each of these major events occurred in each year CCCF has been open. In each of those previous "scandals" Plaintiff alleges several women were dismissed as lacking credibility by ODOC and generally it was not until those women filed suit did ODOC take any action. Additionally, each of those cases involved allegations against supervisors and managers who failed to stop abuse, failed to investigate, failed to supervise and generally turned a blind eye to behavior that violated existing protocols, rules and policies.

116.

The allegations in the 2017 claims against Dr. Snider involved very similar claims as are raised in this litigation including the failure of male medical providers to have chaperones, male providers having unlimited and easy access to women often without medical reason, failure to conduct any audits, chart reviews or any type of process evaluation to ensure the protection of female patients.

117.

Plaintiff is aware of other allegations against other male staff members of sexual misconduct which were never investigated due to severe punitive measures taken against the women, retaliation against those women, removal of privileges including access to personal and phone contact with family, loss of job, loss of access to areas of the prison, removal of all personal possession, searches only involving the complaining women, inappropriate verbal threats and isolating women for additional punitive measures.

118.

CCCF is the only women's prison in Oregon. Staff are poorly trained in investigation of sexual abuse, poorly trained to detect predatory or grooming conduct, are encouraged by other staff to denigrate and mistrust the prisoners' claims of sexual abuse, evidence is rarely collected, women are threatened routinely as part of investigations and there is a pervasive culture which provides ongoing intimidation against women to raise any complaint about any staff member over misconduct especially sexual misconduct.

119.

Each new investigation brings much publicity, some investigations and sometimes prosecution. Each new investigation brings public promises and assurances by ODOC that the problems are only isolated to single bad actors and that the prison system cannot control or manage this situation adequately. ODOC fails to follow suggestions made in past audits concerning staffing, surveillance, electronic monitoring of inmates, severe discipline of

perpetrators, adequate training and adequate internal audits of staff movements, activities and compliance with PREA and law. Usually ODOC just terminates the employment of offending employees and takes no additional action.

120.

Plaintiff alleges that without aggressive federal court intervention and management, the situation at Coffee Creek will continue to worsen, no significant change will occur, and no prisoner will be safe. Plaintiff alleges the systemic and system-wide level of management indifference to the mandates of PREA and the safety of inmates is so significant as to amount to no protection at all. Plaintiff alleges that women are sexually harassed, abused, threatened and mistreated daily at CCCF but the pervasive culture has been successful at deflecting any criticism and avoiding any real and significant change.

121.

Plaintiff seeks the appointment of a court-appointed Special Master to audit, review, interview and investigate the widespread issues alleged in this complaint, to use outside auditors, review their recommendations and make changes to rules, management practice, training and the adherence to PREA as follows:

1.  Select outside auditors to include those who represent the interests of prisoners to review allegations against all staff concerning sexual abuse, harassment, retaliation;

2.  To review all recommendations made by the auditors and to impose those policies, practices and procedures to best protect inmates in all areas of the prison, and including medical;

3.  To review and implement new policies, if called for, to the movement of inmates around the prison so that they are carefully monitored and assessed for their location, reason for movement and the legitimacy of the movement;

4. To review and implement new policies, if recommended, to utilize new technologies including electronic key access to prison locations, to track movement of all persons inside the prison and yard areas and to monitor movement inside the prison;

5. To review and implement new policies restricting male staff personnel assignment to those positions with limited physical access to female prisoners. These policies would examine the assignment of female only staff to housing areas, medical areas, private areas of the prison and would guarantee that male staff are never alone with a female prisoner at any time;

6. To order all changes necessary to protect women from unwanted sexual contact in private secret areas of the prison;

7. To provide training recommendation to prison staff on the standard of care method to assess predatory and grooming sexual behavior and to provide training to managers in detecting and stopping inappropriate sexual behavior;

8. To provide a proper and safe investigative process that shields the victims and witnesses from repercussions from staff and other inmates;

9. To provide access to immediate and ongoing medical and psychological care removed from the fears and orders of interfering management.

**SIXTH CLAIM FOR RELIEF**: Sexual Assault and Battery

State of Oregon/Defendant Klein

122.

Plaintiff realleges all matters previously alleged herein as if more fully set forth.

123.

Plaintiff is entitled to be held in safe and humane conditions of confinement throughout her incarceration. She is entitled to be free of unwanted and unwarranted sexual touching and abuse. She is entitled to her own personal bodily integrity whether in custody or not pursuant to

the parameters of the 8th and 14th Amendments to the United States Constitution. Plaintiff is also entitled to be safe and secure from undue and excessive force while in custody.

124.

The acts and omissions of Defendant Klein violated Plaintiff's protected rights and were an excessive intrusion onto her person without just cause and amounted to intentional violent physical touching. Defendants violated Plaintiff's bodily integrity through the use of excessive force, intentional and abusive sexual assault, and subjecting her to unsafe and inhumane conditions of confinement.

125.

The specific acts of Defendants individually and alleged to be intentional are more particularly set forth below.

4. Defendant Klein physically restrained, sexually touched or caused serious bodily harm and significant mental distress to Plaintiff. The actions of Defendant Klein against Plaintiff occurred in July 2017;

5. Between roughly 2009 and his 2018 removal from the prison, Mr. Klein was sexually molesting, touching, raping or sodomizing numerous other women often on a daily basis;

6. Defendant Klein acted in violation of existing medical protocols, standards of care, the United States Constitution, state and federal laws as well as rules.

126.

As a result of the violations set forth herein, Plaintiff suffered forcible, non-consensual and physical assaults to her person, severe emotional trauma from the ongoing assaults and threats, and a significant deterioration in her mental state causing her to become severely depressed. Ms. Vitellaro suffered extreme fear while the assaults were occurring which was made worse because she knew or believed that no one would stop Klein and would likely blame her. She was isolated, helpless and disregarded. As a result of the violations set forth herein,

Plaintiff has suffered from forms of stress, depression, anxiety and an exacerbation of her underlying problems from early sexual abuse.

127.

As a result of the violations set forth herein, Plaintiff continues to suffer from post-traumatic anxiety, stress, anger and depression and ongoing battles with stress.

128.

As a result of these violations, Plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no less than $5,000,000.

129.

All Defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct was not only well below the standard prescribed by law herein but was illegal per se.

### SEVENTH CLAIM FOR RELIEF:
**Negligent Supervision**
**Failure to Supervise: Sage, Belleque, Peters, Gower, Medical Services Director, Nursing Manager, Shelton, DiGiulio, Steward, Bugher, Fuzi, Dravis, Persson, Meyers and State of Oregon**

130.

Plaintiff realleges all previous paragraphs as if more fully set forth herein.

131.

The deprivations suffered by Plaintiff are the proximate and direct cause of her physical and psychological harm because of a non-interested, indifferent and willfully ignorant supervisory practice by the named defendants. The supervisors have a constitutional duty to protect prisoners and to provide them with a safe and humane condition of confinement including the right to be free from sexual abuse and assault by staff. This duty imposed on supervisory staff includes the obligation under law to fully investigate claims of sexual misconduct by staff against prisoners, the mandatory duty to report and address claims of sexual assault on prisoners, the duty to maintain a good and constant supervision of male staff

supervising female prisoners. The duty is enhanced when the prisoner population is especially vulnerable particularly if they are smaller, physically weaker, more vulnerable because of past sexual abuse and their ability to be easily abused.

132.

The deprivations committed by the supervisory staff was longstanding and in the face of several years of obvious and notable signs about the predatory habits of Defendant Klein, his ability to set his own schedule, roam the facility at will, pull inmates from their housing units during off hours, access to women without chaperones, increasing bizarre and sexualized behaviors, failure to follow recommended guidelines for interactions with patients and prisoners, lack of accountability, numerous rumors and innuendo, and a complete lack of investigation and follow up.

133.

The supervisory staff failed and were negligent in the following particulars:

15. Failed to provide adequate monitoring of Defendant Klein while he treated female patients;

16. Failed to object, stop or discipline Defendant Klein for his obvious, continual and open grooming behaviors, repeated inappropriate touching, repeated inappropriate comments, flirtatious conduct and obvious sexual contact with numerous female inmates on a daily basis;

17. Failed to enforce existing safeguards designed to protect female patients including the use of chaperones;

18. Willfully ignoring clear violations of restrictions on contact and behavior permitted between staff and inmate;

19. Willfully ignoring clear signs of "grooming" and sexualized behavior by staff toward inmates;

20. Failing to monitor Defendant Klein's unlimited access to inmates of his choosing outside of normal medical unit hours;

21. Failed to provide adequate security monitoring of the movement of women to and from medical units;

22. Failed to provide adequate procedures for patients to access medical including movement, signing in and out, procedures for ad hoc orders to visit medical units in off hours, allowing private access by medical providers with inmates, punishing inmates for refusing medical care;

23. Provided an openly hostile, abusive, demeaning and threatening environment for all women prisoners including threatening them proactively with punishment if they complained, automatically dismissing complaints of sexual conduct by staff, removing privileges and benefits of the women if they made complaints of sexual misconduct, actual enforcement of disciplinary measures on women to dissuade them from making complaints, failing to provide anonymity for women to make complaints or participate in investigations, advising women they would be punished for making complaints and a long history of accusing prisoners of lying about sexual experiences;

24. Failed to permit the victims of Defendant Klein's sexual abuses access to their own chosen PREA advocate Brianna Ellingson by summarily dismissing her in the middle of the Klein matter without explanation and failing to provide an adequate easily accessible replacement;

25. Engaging in intimidating behaviors when the victims of sexual abuse met with their lawyers, received legal mail or received information from Ms. Ellingson;

26. Ordering BHS counselors not to provide sexual abuse survival counseling to the victims;

27. Failing to provide adequate post-abuse therapeutic counseling despite repeated requests by the victims;

28. Engaging in inappropriate searches, confiscating legal mail, and reading and seizing therapeutic journals kept by the women;

29. Failed to implement adequate inmate monitoring and managing process after the repeated sexual violations at CCCF noted above;

30. Failed to provide adequate safeguards to keep inmates from meeting alone with staff;

31. Failed to ensure that male medical providers were chaperoned in physical exams with women;

32. Failed to do regular audits and evaluation of inmate movement to medical including keeping records of the reason for the visits, the timing and the nature of the visit;

33. Failed to note and respond to evidence of abuse, and the obvious and clear record of a serial predatory sex offender in their midst;

34. The supervisors refused to take action because they purposefully disregarded the complaints of prisoners, did not believe anyone would care about the well-being of the prisoners, did not believe anyone would believe prisoners and generally allowed Klein to thrive in plain sight;

35. Supervisory staff treated the prisoners as if they deserved the abuse they received. If anyone of the supervisory staff had followed through on the complaints and obvious signs of abuse none of the plaintiffs in this action would have been sexually assaulted or abused;

36. Supervisors tolerated if not encouraged an atmosphere of bullying, threatening and retaliating against inmates who came forward with concerns about the sexual behavior of staff;

37. Supervisors tolerated and encouraged staff to take proactive measures discouraging complaints about sexual behaviors;

38. Supervisors refused to allow victims to access legal mail, legal counselors, searched legal mail, instructed grievances to be denied and delayed for arbitrary reasons by Ms. Arrington and made visits to intimidate women meeting with PREA advocates and lawyers;

39. Supervisors have taken an informal policy approach that the staff members are more important than prisoners and must be protected from any and all complaints by prisoners; and

40. Supervisors issued orders that the victims of Klein would not receive the guarantees of federal and state law including mental health counseling and access to their chosen PREA advocate.

134.

Furthermore the supervisory staff failed these plaintiffs by failing to institute national standards for prison security by failing to inspect staff members coming and going from prison, failing to stop the introduction of contraband into the prison by staff, failing to follow up on location and work production by subordinate staff, failing to demand accountability by subordinate staff, failing to have safe and adequate investigative procedures for complaints made by prisoners toward staff.

135.

As a result of the practices by ODOC supervisors which were promoted, allowed, or facilitated within CCCF, female informants, witnesses or victims of sexual abuse were ignored, punished or retaliated against for filing complaints of sexual abuse. As a result of the behaviors of the defendants herein, Plaintiff suffered repeated sexual assault, was placed in constant fear for her safety, felt fear to meet with advocates, was denied abuse counseling, could not safely access medical care and her underlying anxiety and PTSD were severely exacerbated.

WHEREFORE Plaintiff prays for relief:

1. Findings that any or all defendants violated her protected Constitutional rights;

2. Findings that as a result of the Constitutional violations alleged herein Plaintiff has sustained harm and damages in an amount no less than $5,000,000;

3. Findings that the cause of the constitutional violations is intentional or so grossly and deliberately indifferent to justify the award of punitive damages against each named defendant in a sum no less than $100,000 each;

4. Findings that there exists an ongoing harm to all women still in custody and that without preliminary orders and the appointment of a Special Master, no changes will be made and women will continue to be sexually abused, raped and harmed; and

5. Findings that Plaintiff was subject to sexual battery and assault as a result of the actions of individual in the employment of the State of Oregon

6. Findings that plaintiff is entitled to her attorney fees and costs.

Dated this 28th day of January 2019.

Respectfully submitted,

/s/Michelle R. Burrows
Michelle R. Burrows OSB861606
Attorney for Plaintiff